SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**Borough of Saddle River v. 66 East Allendale, LLC (A-126-11) (070525)**

**Argued April 29, 2013 -- Decided October 21, 2013**

**LaVECCHIA, J., writing for a majority of the Court.**

In this appeal, the Court considers whether, in a trial on just compensation, it was proper to allow the jury to hear evidence on the likelihood of a zoning change without the trial court first determining outside of the jury's presence that there was a reasonable probability of a zoning change.

East Allendale, LLC (East Allendale) owned a 2.13 acre parcel of land in the Borough of Saddle River (Borough). Part of the property was located in the office zone (O-1), which restricts improved lot coverage to 30 percent of the lot's total area. In 2004, East Allendale submitted an application to the Borough's Zoning Board of Adjustment (Board) for a permit to build a 10,000 square foot bank building and parking lot on the property. The site plan required approval of a bulk variance, pursuant to N.J.S.A. 40:55D-70(c)(2), to allow 42 percent improved lot coverage in the O-1 zone. The Board initially denied the permit and East Allendale subsequently withdrew its application in the face of critical questioning prior to the Board's final action. On November 8, 2006, the Borough filed a complaint exercising its power of eminent domain in order to acquire the subject property for use as a public park. After the parties agreed that the Borough duly exercised its power of eminent domain, the court appointed three commissioners to determine the just compensation owed to East Allendale. The commissioners completed their appraisals and the court entered an order determining the just compensation for the taking to be $1,593,625. The parties appealed and demanded a jury trial. Just compensation was the sole trial issue.

Prior to trial, the Borough filed a motion in limine seeking to strike the reports of East Allendale's expert witnesses as inadmissible net opinions on the reasonable probability of a zoning change for the property. In the alternative, the Borough requested that the court perform its gatekeeping function pursuant to State by Commissioner of Transportation v. Caoili, 135 N.J. 252 (1994), and conduct a preliminary N.J.R.E. 104 hearing outside the presence of the jury to assess whether there was a reasonable probability of a zoning change. The trial court denied the Borough's motion. The court deferred until trial any decision on whether East Allendale's experts' reports constituted net opinions. The court did not regard Caoili as requiring it to have a pretrial hearing and found that it could satisfy its gatekeeper function during trial through voir dire of witnesses, N.J.R.E. 104 hearings prior to witnesses taking the stand, and jury instructions.

At trial, East Allendale's experts testified that that highest and best use of the property would be a 10,000 square foot bank building, which was the subject of East Allendale's 2004 application, and that there was a reasonable likelihood that the application would be entitled to a bulk variance for the use in excess of the O-1 zone requirements. Although the experts were permitted to present the arguments that they would have set before the Board in favor of the bulk variance, they did not address the positive and negative criteria under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, which would have been required for Board approval. Based on the experts' opinion that there was a reasonable probability that a bulk variance would be granted, East Allendale's appraiser testified that the property had a fair market value of $5,250,000. The Borough's experts proposed a site plan that provided for a 3,312 square foot bank, which did not require a bulk variance and was appraised to have a $1,325,000 fair market value. Prior to jury deliberation, the Borough renewed its motion to strike the testimony of East Allendale's experts. The trial court denied the motion. The court found a reasonable probability of a potential zoning change and that the jury may consider the possibility of a zoning change when determining the property's value. The jury returned a verdict for just compensation in the amount of $5,250,000.

The Appellate Division affirmed. The panel concluded that there was sufficient evidence of a reasonable probability of a zoning change and that the jury could consider that evidence. Borough of Saddle River v. 66 East Allendale, LLC, 424 N.J. Super. 516 (App. Div. 2012). The panel found that Caoili does not require the judge to

conduct a pretrial hearing in every case and that the judge did not abuse his discretion in performing his required gatekeeping function before closing arguments, instead of before the jury heard the evidence. The panel also determined that there was a sufficient objective foundation for the experts' opinions that the zoning board would likely grant a bulk variance. The Court granted the Borough's petition for certification. 211 N.J. 274 (2012).

**HELD**: The jury heard evidence about the probability of a zoning change that should have been ruled on by the judge in advance and outside of the jury's presence. A new trial on just compensation is required because the jury was allowed to hear speculative evidence that undermined the soundness of its property valuation determination.

1. The Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, requires the state or one of its municipalities to pay the property owner just compensation for the taking of private property. Just compensation is the fair market value of the property as of the date of the taking in light of its highest and best use. The highest and best use is the use that produces the highest value, provided the use can be legally and physically achieved. Therefore, zoning restrictions are material factors in determining a property's fair market value. In State by Highway Commissioner v. Gorga, 26 N.J. 113 (1958), the Court concluded that a potential amendment to a zoning ordinance may affect the value of the property. The Court cautioned, however, that a court must first determine whether there is evidence of the probability of the zoning change before submitting the issue to the jury. In Caoili, the Court established a two-step process for evaluating potential zoning changes. First, as a gatekeeping function, the court must determine whether there is sufficient evidence to support the conclusion that a zoning change is "reasonably probable." After that determination is made, the jury determines whether a premium should be added to the value of the property based on the probability of the future zoning change. (pp. 27-33)

2. The goal of Caoili's gatekeeping function was to avoid having the jury hear and consider speculative evidence that a zoning change was reasonably probable when assessing just compensation. Only when the trial court first determines that evidence is of a sufficient quality to allow the jury to consider the probability of a zoning change should the jury be permitted to assess a premium based on that zoning change. In this case, the trial court's failure to hold a pretrial hearing on the reasonable probability of a zoning change was at odds with Caoili and permitted the jury to hear speculative testimony on the likelihood that a bulk variance would be granted. Every condemnation action involving a future zoning change does not require an N.J.R.E. 104 plenary hearing prior to trial. The trial court should first determine whether it can render its determination on the papers alone. If the issue cannot be resolved on the basis of paper submissions, such as in this case, then the issue should be heard and resolved prior to trial. (pp. 33-37)

3. The trial court must render its determination that there is a reasonable probability of a zoning change based on the standard that would govern the particular zoning change under consideration – here, whether or not the Board would grant a bulk variance. The expert testimony in this record was insufficient to support the reasonable probability of a zoning change because it did not address all the criteria that the Board would have to find in order to grant a bulk variance. In particular, East Allendale's experts failed to address the positive and negative criteria that the Board would have had to consider before granting a bulk variance. Furthermore, East Allendale's appraisal analysis relied on the experts' opinions that a bulk variance would likely be granted. Therefore, East Allendale's experts' opinions lacked a proper foundation for their conclusions that zoning change was reasonably probable. (pp. 37-40)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** for a new trial on just compensation.

**JUSTICE ALBIN, DISSENTING**, joined by **CHIEF JUSTICE RABNER**, expresses the view that the majority has failed to give proper deference to the trial court's evidentiary rulings and to the factfindings of the jury.

**JUSTICES HOENS and PATTERSON join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion, in which CHIEF JUSTICE RABNER joins. JUDGES RODRÌGUEZ and CUFF (both temporarily assigned) did not participate.**

BOROUGH OF SADDLE RIVER,

    Plaintiff-Appellant,

       v.

66 EAST ALLENDALE, LLC,

    Defendant-Respondent.

Argued April 29, 2013 – Decided October 21, 2013

On certification to the Superior Court,
Appellate Division, whose opinion is
reported at 424 N.J. Super. 516 (2012).

Robert J. Kipnees argued the cause for
appellant (Lowenstein Sandler, attorneys;
Mr. Kipnees and Natalie J. Kraner, on the
briefs).

Peter H. Wegener argued the cause for
respondent (Bathgate, Wegener & Wolf,
attorneys).

Matthew Weng submitted a brief on behalf of
amicus curiae New Jersey State League of
Municipalities.

JUSTICE LaVECCHIA delivered the opinion of the Court.

In this appeal, we review an appellate judgment that affirmed a $5.25 million condemnation award for defendant 66 East Allendale, LLC (East Allendale) against plaintiff Borough of Saddle River (Borough).  For the reasons that follow, we

1

reverse that judgment and remand for a new trial on just compensation.

In a condemnation action the determination sought is the amount of just compensation.  Just compensation is a function of the value of the property in light of its highest and best use, which is ordinarily evaluated in accordance with current zoning ordinances.  Certain circumstances may permit valuation to include an assessment of a change in the permitted use of a property, but only if there is a reasonable probability that a zoning change would be granted.  As our decisions in State by Highway Commissioner v. Gorga, 26 N.J. 113 (1958), and State by Commissioner of Transportation v. Caoili, 135 N.J. 252 (1994), make plain, however, the jury in a condemnation action may not speculate about such a change in a property's use.  If valuation of a property based on another use is to be considered by a jury, the determination of reasonable probability of a zoning change must be made by the judge before the evidence is presented to the jury, and it must be made clearly to enable appellate review.

In this matter, the jury was allowed to hear evidence about the probability of a zoning change that should have been ruled on by the judge both in advance and outside of the jury's presence.  Only if the court first determined that there was a reasonable probability that a zoning change would have been

2

approved based on the standards governing such approval should the evidence have been presented to the jury for its consideration in connection with the jury's evaluation of just compensation.  The evidence that the jury heard on the likelihood of the zoning change in issue here was not assessed properly in accordance with that standard, and the quality of the evidence that the jury was allowed to consider undermined the soundness of the jury's property valuation determination. The errors necessitate a new trial on the issue of just compensation.

I.

A.

The Borough initiated this condemnation action to acquire East Allendale's property located at 66 East Allendale Road. The property is split-zoned; the majority of the property is in a residential zone, and the remainder of the property is in an office zone.  When the parties could not agree on the just compensation owed to East Allendale, the Borough commenced condemnation proceedings.

In fixing the fair market value of the property, the parties agreed that a bank building would be the property's highest and best use.  However, they disputed the size of the bank that would have been approved under the Borough's zoning ordinance.  East Allendale proposed the development of a 10,000

3

square foot bank and office building with an adjacent parking lot. The Borough proposed a 3,312 square foot bank branch with an adjacent parking lot.

In respect of the approvals necessary for the project as proposed by East Allendale, the parties further agreed that East Allendale was entitled to a use variance to permit development of a parking lot in the portion of the property that is within the residential zone. Their dispute devolved into a sharp disagreement on the intensity of use proposed by East Allendale. Specifically, the parties dispute whether a bulk variance would have been granted to permit a 10,000 square foot bank building that would entail 42 percent of improved lot coverage, which would have exceeded the ordinance requirement of no more than 30 percent improved lot coverage.

With that brief overview of the underlying dispute, we turn to the relevant background about this property and the critical aspects of the condemnation proceedings.

B.

East Allendale purchased the 2.13 acre parcel of land located at 66 East Allendale Road in the Borough[1] in December

---

[1] The Borough of Saddle River is a residential community in Bergen County. Nearly 98 percent of the Borough is zoned for residential use. According to the Borough's 2003 Master Plan Reexamination Report, it is a "residential community with business development limited to that necessary to serve the daily needs and convenience of local residents." One of the

2002, for $900,000, intending to develop the property.  The property is split-zoned with approximately one-third of the land in the office zone (O-1) and two-thirds of the land in the residential zone (R-1).  During the pendency of the condemnation proceedings, the zoning requirements remained unchanged.

The O-1 zone permitted banks, offices, and other public uses.  The Borough's O-1 zoning ordinance restricted improved lot coverage to 30 percent of the lot's total area, required a minimum lot size of 10,000 square feet, and imposed parking requirements of one parking space for every 75 square feet of bank space and one parking space for every 250 square feet of office space.  The R-1 zone required a lot size of two acres and generally permitted single-family residences.

In October 2004, East Allendale, in conjunction with a development plan in which it was involved, submitted an application to the Borough's Zoning Board of Adjustment (Board) for a permit to build a 10,000 square foot bank office and building, and an adjacent parking lot on the property.  Within its permit application, East Allendale sought a use variance, pursuant to N.J.S.A. 40:55D-70(d)(1), to use a portion of the R-1 part of the property as a parking lot.  See N.J.S.A. 40:55D-70 (recognizing board of adjustment's authority to hear

Borough's primary objectives is to preserve the environment, which is reflected in municipal zoning ordinances.

applications for variances in connection with permit applications). David Hals, a professional engineer and planner, prepared the site plan. The site plan proposed a 10,000 square foot, two-story bank and office building requiring a minimum of 57 parking spaces as the property's "highest and best use." The plan required approval of a use variance to allow parking in the R-1 zone and a bulk variance, authorized pursuant to N.J.S.A. 40:55D-70(c)(2), in the O-1 zone to allow 42 percent improved lot coverage. The Borough conceded that, pursuant to the holding in AMG Associates v. Township of Springfield, 65 N.J. 101, 113-14 (1974), the local zoning board likely would grant a use variance to permit construction of parking on the R-1 portion of the property due to the lot's split zoning (residential and commercial).[2]

The Board denied the permit because the proposed improved lot coverage in the O-1 part of the property exceeded the maximum of 30 percent of improved lot coverage. At the hearing, facing critical Board questioning and opposition by several concerned citizens, East Allendale withdrew its application for a use variance prior to final action by the Board.

On November 8, 2006, the Borough exercised its power of eminent domain pursuant to N.J.S.A. 20:3-1 to -50 in order to

---

[2] Thus, the only issue in this appeal concerns the bulk variance required in order to permit 42 percent improved lot coverage contrary to O-1 zone requirements.

acquire the subject property for use as a public park. The Borough filed a verified complaint in the Superior Court, Law Division, see N.J.S.A. 20:3-8, and submitted an appraisal stating the land's market value was $1,050,000. East Allendale filed an answer challenging the Borough's exercise of eminent domain and demanding a jury trial.

The parties attempted to resolve the matter themselves as well as through mediation. A partial settlement was reached, and on March 6, 2009, the court entered an Order for Judgment and Appointing Commissioners, concluding that the Borough duly exercised its power of eminent domain. The court appointed three commissioners to determine the compensation owed to East Allendale, and it entered a Consent Order to Withdraw Funds on Deposit, whereby $1,050,000 previously paid to the clerk of the court by the Borough was paid to East Allendale.

The commissioners completed their appraisals, and the court entered an order on December 18, 2009, determining the just compensation for the taking to be $1,593,625. East Allendale filed a Notice of Appeal on December 23, 2009; the Borough filed a Notice of Cross-Appeal on December 31, 2009, and demanded a jury trial.

C.

Prior to trial, the Borough filed a motion in limine seeking an order to strike the reports of East Allendale's

expert witnesses as inadmissible net opinions because in the reports the experts' opinions on the reasonable probability of a zoning change lacked a proper foundation.[3]  Specifically, the Borough's argument focused on the requirements for deviation from ordinance requirements set forth in the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163.   Submitted with the motion were the reports as well as the deposition testimony of East Allendale's expert witnesses, David Hals, Peter Steck, Shergoh Alkilani, and Jon Brody.  In the alternative, the Borough requested that the court perform its gatekeeping duty by conducting a preliminary Rule 104 hearing outside the presence of the jury to assess whether there was a reasonable probability of a zoning change for the property.  See Caoili, supra, 135 N.J. at 252.  East Allendale filed its own motion in limine to bar the report of the Borough's appraisal expert.

The trial court denied the Borough's motions, as well as East Allendale's, determining to defer until trial any decision on whether the reports of East Allendale's experts constituted net opinions about whether there was a reasonable probability of

---

[3] The opinions were characterized by the Borough as net opinions. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011) (explaining that "net opinion" is "an expert's bare opinion that has no support in factual evidence or similar data" (citations omitted)).  An expert must provide the "'why and wherefore' that supports the opinion, 'rather than a mere conclusion.'"  Ibid. (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).

a zoning change. The court expressed its view that the defense could "build a proper foundation which [would] not make those opinions net opinions" and, therefore, concluded that the testimony would be heard and objections considered at trial.

Considering the Borough's alternative application for a Rule 104 hearing to be conducted pretrial, the court determined that such a hearing would be inefficient in terms of both time and money, and would not serve the interest of justice. The court stated that it could not rule based on the briefs because it could not "weigh testimony," could not "decide on credibility," and could not "weigh the import of expert opinions." The court did not regard Caoili as requiring it, "as gatekeeper, to have an expansive hearing prior to trial in order to fully vet these issues." Rather, the court determined that N.J.R.E. 611 permitted the court to determine the most "efficient use of [his] time, the Court's time, counsel's [sic] time, the parties' time, and the jury's time in terms of time and expense," explaining that a "three, four, five, six, seven-day evidential hearing" would incur "undue expense and time and money for all the parties." The court explained that the gatekeeper function could be performed during trial because the court could voir dire witnesses regarding qualifications and could conduct a Rule 104 hearing prior to a witness taking the stand. Further, the court expressed the view that jurors would

be capable of hearing information and putting it aside if the court instructed them to do so.

Pretrial, East Allendale also sought the court's authorization to present testimony at trial that the zoning ordinance requiring 30 percent improved lot coverage in the O-1 zone was invalid, claiming that the ordinance "makes no rational sense whatsoever, is not reasonably related to any zoning purpose and has never been enforced against anyone in the history of the town." East Allendale contended that there was "[n]o reasonable likelihood that this ordinance could be enforced to deny a land use application by a prospective purchaser in this case." However, the court refused to hold that, as a matter of law, the ordinance was invalid, explaining that this was not an action in lieu of prerogative writs and therefore the validity of the ordinance was not before the court.

D.

The trial began on October 18, 2010, and ended on November 3, 2010. The sole issue for determination was the just compensation due East Allendale. To supplement the stipulation that the highest and best use of the property would be a bank, East Allendale's expert Shergoh Alkilani, a retail and bank developer, had prepared a feasibility report showing the suitability of the property as a bank site. Alkilani testified

10

in accordance with that report that the property was a prime location for a bank and further explained how the demographics and income growth in the Borough supported not a simple bank branch but a bank headquarters in the location. East Allendale's other experts then testified about three proposed options for that form of bank building.

1.

East Allendale's first proposal was the 10,000 square foot bank building, which was the subject of East Allendale's 2004 application to the Board, developed by David Hals. This building would house a 2,000 square foot bank and have 8,000 square feet for offices. The entire building would be located on the O-1 portion of the property. A proposed parking lot would be located on the R-1 portion of the property, and as noted earlier, the parties agreed that a use variance for the parking lot would have been granted under AMG. However, this application also would have required a bulk variance, pursuant to N.J.S.A. 40:55D-70(c), for a total improved lot coverage that constituted 42 percent, instead of the 30 percent improved lot coverage permitted under the Borough's requirements for O-1 zoned property. East Allendale presented evidence that a "c-2"

or "flexible" bulk variance[4] would have been granted for this proposed use.

Notwithstanding that the 2004 application had been withdrawn in the face of citizen opposition and critical questioning when it had been before the Board, Hals opined at the condemnation proceeding that there was a reasonable likelihood that the application would be entitled to both a use variance for placement of the parking in the R-1 zone of the lot and a bulk variance for the intensity of the use in excess of the requirements of the O-1 zone. Hals opined that it would not be possible to construct a usable bank/office building that met all of the ordinance requirements, including the 30 percent improved lot coverage and the front and side yard setbacks. Hals presented the Borough's ordinance changes, which showed that the improved lot coverage in the O-1 office zone and B-1

---

[4] See N.J.S.A. 40:55-70(c)(2) (requiring that application in respect of property demonstrates that "purposes of [MLUL] would be advanced by a deviation from . . . ordinance requirements and the benefits of the deviation would substantially outweigh any detriment"). Thus, this variance approval required the party requesting the variance to prove both positive and negative criteria: there must be a benefit to the community from granting the variance that outweighs the detriment to the zoning plan, and the purposes of the MLUL must be advanced. See Medici v. BPR Co., 107 N.J. 1, 22-24 (1987); see also TSI E. Brunswick, LLC v. Zoning Bd. Of Adjustment of E. Brunswick, 215 N.J. 26 (2013) (noting same and addressing quality of proof issues). The purposes of the MLUL include the provision of "adequate light, air and open space," the provision of certain uses to serve the needs of the community, advancing the aesthetics of the development, and safeguarding the environment. See generally N.J.S.A. 40:55D-2.

business zone previously had permitted 75 percent of improved lot coverage and he highlighted the ordinance revision that, in 1987, established the O-1 zone's current 30 percent improved lot coverage limitation. Additionally, Hals testified about commercial development in the Borough and represented that none of the commercial properties complied with the existing 30 percent improved lot coverage requirement. That current "noncompliance" –- concededly existing as a result of property improvement previously approved under prior versions of the zoning ordinance –- was asserted to be inconsistent with the objectives of the MLUL.

Throughout Hals's testimony, the Borough objected to his opinions on the basis that they lacked a foundation. The objections were not successful and the testimony was admitted. The judge conducted an N.J.R.E. 104 hearing, outside the presence of the jury, specifically to determine whether Hals's testimony analyzing other municipalities' zoning ordinances was relevant to whether the Borough would have granted a bulk variance in this case. The court permitted Hals to testify that he would have made a c-2 bulk variance application and to present the arguments that he would have set before the Board, including his argument that ordinances in other municipalities made it reasonable for the Board to grant a bulk variance in this case.

13

Before the jury, Hals testified to the information allowed by the court's ruling described above and, further, that the variance would be granted by the Board because the application would advance the purposes of the MLUL:  the application would be consistent with other commercial property layouts in town; the layout is aesthetically pleasing; the landscaping would promote adequate light, air, and open space; there is no overbuilding of the property by using 42 percent improved lot coverage; and the site plan is sensitive to the surrounding residential areas.  Beyond that, Hals did not further address how the granting of the bulk variance for this specific property would provide a positive benefit to the community from a zoning perspective.  Nor did he specifically address how the variance could be granted without impairing the intent and purpose of the zone plan and ordinance (the negative criteria), which is what the Board would have been required to conclude in order to grant the variance.  Hals pointed to earlier approvals granted when the Borough had more lax standards in place, which does not address the current intent and purpose of the zone plan and ordinance.  He also noted actions taken in other towns in respect of improved lot coverage but that is ordinarily not relevant to the instant town's zone plan.  Nevertheless, based on that analysis, Hals opined that the "c-2" flexible bulk

14

variance for the improved lot coverage had a reasonable probability of being granted.

Peter Steck, a professional planning expert who reviewed Hals's 2004 plan, also opined that the property would justify a use variance, pursuant to AMG, for parking, as well as a bulk variance allowing either for a reduction in the required number of parking spaces or to permit the 42 percent lot coverage. In his opinion, it would be possible to obtain a bulk variance to reduce the number of parking spaces required for the building because other municipalities required less parking for banks.[5] He ultimately opined that there was a reasonable probability that a 10,000 square foot bank building could be approved with variances.

Additionally, Conrad Caruso, a former Borough mayor and Planning Board member, and an investor in the proposed new bank, testified about the 2004 application. He asserted that the application was withdrawn because it was not in the best interests of the bank's investors and that, as a result, he had discussed a leasing option with East Allendale and its

---

[5] Steck opined that either a hardship bulk variance, see N.J.S.A. 40:55D-70(c)(1), or a flexible bulk variance had a reasonable probability of being granted, although East Allendale's application was premised on a flexible variance. He opined that either would be consistent with the MLUL in terms of demonstrating the required positive and negative criteria and would achieve the MLUL's purposes, essentially for the same reasons as those stated by Hals.

15

investors.  During cross-examination of Caruso, the judge conducted an N.J.R.E. 104 hearing, outside the presence of the jury, regarding prior statements made by then-Mayor Caruso in a local newspaper article regarding the reasons for withdrawing the 2004 application.  The judge permitted the testimony, and Caruso admitted, on cross-examination before the jury, that he had made prior statements regarding a potential smaller bank on the property because the community and Board would not permit a building of the size requested in the 2004 application.

Jon Brody, an expert real estate appraiser and consultant, prepared an appraisal report that was based on Hals's report of the 2004 site plan provisions, the location of the property, the demographics, and the zoning provisions.  He agreed that the highest and best use of the property was a bank.  Outside the presence of the jury, the court conducted an N.J.R.E. 104 hearing, heard argument from the parties, and concluded that Brody could testify that, based on his review of Hals's opinion and his experience as an appraiser, there was a reasonable probability that the variance would be granted.  However, the court prohibited Brody from explaining why the variance would have been approved because he was not a professional planner and thus not qualified as an expert to make that assessment.  Nevertheless, Brody subsequently opined that the bulk variance would have been approved.

16

Brody discussed the comparable sales and adjustments he used to determine the fair market value of the property at the time of the Borough's taking. His appraisal compared four properties purchased for the purpose of a bank, as well as three leases. One property in Norwood sold for $2,650,000. A second property, located in Hackensack, was purchased by Commerce Bank for $2,300,000. A third property in Elmwood Park sold for $1,862,500. The fourth comparable involved property located in Garfield that sold for $3,000,000. Brody adjusted those sales downward by 15 percent for the risk of approvals and made additional adjustments for time, location, and characteristics of the property. The comparables that involved leases adjusted to a sale price for comparison purposes included an East Rutherford property, with a sale price of $2,648,000, property in Paramus, with a sale price of $2,940,000, and property located in Hackensack and leased to Mariners Bank, with a sale price of $2,268,000.

Finally, Brody used three methods to determine the value of East Allendale's property. A square-foot-of-land analysis resulted in a valuation of $5,567,000; a floor-ratio analysis resulted in a valuation of $5,180,000; and a lease analysis resulted in a valuation calculated to be $5,050,000. From those analyses, Brody concluded that the property had a fair market value of $5,250,000 as of November 8, 2006.

2.

East Allendale's second proposal included a 10,000 square foot bank building with parking underneath the building. In this plan the building proposed would straddle the two zones, which altered the variances that would be required. According to Hals, this layout would not have required a bulk variance because it would conform to the 30 percent improved lot coverage requirement and would only require a use variance. However, Hals opined that the 2004 site plan was a better zoning alternative.

3.

The final site plan proposed by East Allendale was developed in 2006 by Geof Mulford, a principal investor of the 66 East Allendale property. This plan envisioned a subdivision of the property for a 6,000 square foot bank building on the O-1 portion of the lot and a residence located on the R-1 portion of the lot. This plan necessitated at least three variances. Mulford testified that these plans were abandoned. He did not seek approval for them because the Borough voted to obtain the funding to acquire East Allendale's property. Mulford stated that he believed both the 2004 plan and the 2006 plan would have been approved and would have given him the same return.

Hals conceded that this third plan would have required numerous variances but nevertheless opined that the plan had a

18

reasonable probability of being approved, although he gave no specific explanation as to how this plan would have met the positive and negative criteria.

4.

The Borough's experts proposed a site plan that provided for a 3,312 square foot bank branch. Martin Spence, the Borough Engineer, and Richard Preiss, a professional planner, developed the plan for the property together. Spence testified that the only required variance would have been a use variance to allow the parking lot to be built in the R-1 zone, and the Borough conceded that a use variance would have been granted pursuant to AMG. A bulk variance under the Borough's plan would have been unnecessary because the improved lot coverage was below 30 percent. Preiss, an expert in municipal planning, testified that the 3,312 square foot bank branch was a reasonable use of the property because it placed the bank building in the O-1 zone, would meet the improved lot coverage limitation, and permitted the parking in the R-1 zone as a reasonable use with the least detrimental impact on the residential portion of the property as permitted by AMG.

Hugh McGuire, an expert in real estate appraisal, supported the findings and conclusions in Preiss' report. Based on his experience appraising other bank branches, McGuire concluded that the highest and best use of the property was a single-story

19

bank branch.  McGuire discussed in detail four comparable sales that he used to determine the fair market of East Allendale's property, all of which had approvals in place at the time of sale.[6]  He then subtracted 25 percent from the sales prices of those comparables to adjust for the fact that each involved a contract of sale with all land use approvals for the intended use in place as opposed to the situation involving East Allendale's property.  He also made time adjustments for market conditions, location adjustments, and riparian buffer adjustments because a portion of the property was unusable due to the flowing waters nearby.  After applying the adjustments and reviewing the dollar per square foot for each comparable, McGuire determined that East Allendale's property's fair market value was $400 per square foot and, accordingly, the 3,312 square foot bank building would have a fair market value of $1,325,000.

The Borough's witnesses also criticized East Allendale's proposed plans.  Spence pointed out several items that were missing from the East Allendale application, including a drainage plan, a traffic impact study, and a lighting design. More importantly for purposes of this appeal, Spence disputed the opinion of Hals that the 2004 site plan had a reasonable probability of achieving approval for the bulk variance that it

---

[6] We note that two of these comparable sales were used by Brody.

20

needed.  Preiss opined that East Allendale's plan went beyond the reasonable use of the property, that a bulk variance would not have the least detrimental impact on the zoning plan, and that, in fact, the variance would cause a substantial detriment to the zoning plan, therefore failing to satisfy the negative criteria.  He further opined that an office building in the O-1 zone and a residential dwelling in the R-1 zone would be feasible, but that a bank branch in the O-1 zone under this type of plan would not be a viable option due to its small size and lack of a drive-through.  Alternatively, he opined that a bank branch in the O-1 zone, encroaching into the R-1 zone, along with a residence on the R-1 zone (essentially Mulford's 2006 plan) would not reasonably have been approved.

5.

On November 3, 2010, prior to jury deliberation, the Borough renewed its motion to strike the testimony of East Allendale's experts, Steck, Hals, and Brody.  The court denied the application, stating:

> I find that there's enough of a -- of a finding of a reasonable probability of a potential zoning change, as I understand the law in Caoili.
>
> I simply point briefly to the prior -- the revisit to the zoning change that was proffered.  The weights of that, the political issues behind that by the planner is well before this jury.  Nevertheless, it was considered -- this potential zoning

21

change was considered by the Borough at least once.

Secondly, the Court also points out as I'm permitted to do that although the evidence as to other zoning changes during the pendency of the issues involving the plaintiff and defendant were brought before the town officials and they considered zoning changes. Although that's not evidential for this jury purposes and in fact would be inappropriate because they were in the context of settlement discussions and it would be highly improper for the reasons I've articulated to have the jury hear that. Nevertheless, I can consider those type of non evidentiary issues from my gate -- my threshold findings, as I do in any rulings on evidence.

And that there are also indications that this Borough has made zoning changes to office portions of their zoning and the issues of the -- the commercial zone and the office zone and the preexisting use and the difficulties of the split zoning and for all those issues I reject the plaintiff's motion to strike the testimony of those various experts and that issue will be presented to the jury for their consideration. That is, they may consider the possibility of a zoning change, which would, therefore, impact the value of the property.

After the court instructed the jury on the law, the jury returned a verdict for East Allendale for just compensation in the amount of $5,250,000.

The Borough filed a Motion for a New Trial or, in the alternative, Remittitur on November 23, 2010. The Borough argued that the court erred by permitting "defendant's expert

22

testimony on the probability of the grant of the variance." Specifically, the Borough took issue with the testimony of Hals and Steck, which contributed to the appraisal testimony of Brody. The Borough claimed that Steck and Hals did not address both the positive and negative criteria as required by the MLUL to show that it was reasonably probable that the bulk variance would have been granted. The Borough asserted that the error resulted from the trial court's failure to perform properly its gatekeeping function as required by Caoili.

The court denied the Borough's motion, noting that its arguments were presented and argued pretrial and during trial. The court reiterated its conclusion that the opinions of Hals and Steck were not net opinions. Rather, in the court's view, they provided evidentiary support that a zoning change was probable and that it was reasonable for Brody to rely on those opinions for his appraisal. The court also asserted that it performed its gatekeeping function under Caoili to determine that the bulk variance would have been reasonably granted. The court entered an order denying the Borough's motion on January 7, 2011, and entered final judgment for East Allendale in the amount of $5,250,000 the same day. An appeal and cross-appeal were timely filed with the Appellate Division.

E.

On appeal, the parties reiterated arguments raised in the motion for a new trial and throughout the trial, including whether the court properly performed its gatekeeping function and whether the opinion testimony should have been admitted into evidence before the jury.  The Borough first argued the trial court failed to perform its gatekeeping function properly to determine whether, as a matter of law, there was a reasonable probability of variance approval before submitting the issue to the jury.  Second, the Borough asserted that as a result of the court's failure to treat the reasonable probability of approval inquiry as a question of law, the court charged the jury with an unclear and misleading instruction -- one that allowed the jury to determine as issues of fact what change would have been permitted and what a reasonable Board would approve.  Third, the Borough argued that the court should have barred East Allendale's appraisal testimony because Brody used a flawed and improper methodology and based his appraisal on net opinions. East Allendale contended that there was no fatal flaw in the trial court's procedural handling of the case and that the expert testimony was properly admitted.

The Appellate Division rejected the Borough's arguments that the jury should not have heard the evidence about the reasonable probability of a zoning change, concluding that there was sufficient evidence of a reasonable probability of a zoning

24

change and that the jury could consider that evidence.  Borough of Saddle River v. 66 E. Allendale, LLC, 424 N.J. Super. 516, 522 (App. Div. 2012).  The panel stated that although it was "preferable [for the court] to make the threshold determination before the trial begins," given that the pretrial hearing could have been seven days, the judge did not abuse his discretion in concluding that the evidence met the reasonable probability requirement before closing arguments.  Ibid.

Further, the panel concluded that the case law did not support the standard of proof urged by the Borough in which the trial judge must screen out unreliable evidence as part of the gatekeeping function.  Id. at 530.  Prior to commencing trial, the trial judge determined that the court's authority under N.J.R.E. 611 provided him the ability to determine how most efficiently to manage the proceedings.  Id. at 531-33.  Ultimately, the "judge did not abuse his discretion in deciding that the evidence was sufficient to warrant a determination by the jury that a zoning change was reasonably probable."  Id. at 534.  In this case, the panel concluded that "the evidence was therefore not unduly speculative or potentially unreliable."  Id. at 535 (citation omitted).

The panel also rejected the argument about erroneous jury instructions, which allowed the jury to consider the reasonable probability of the zoning board's approval of the bulk variance.

25

Id. at 536. Related to that argument, the panel explained that Caoili does not require the judge to conduct a pretrial hearing in every case, although the panel recognized that Caoili had been interpreted to require "the judge [to] make a threshold determination as to whether the prospective zoning change is reasonably probable in the near future." Ibid. (quotation marks and citation omitted). However, due to the trial court's estimate about the length of time the pretrial hearing would have taken in this case, the panel declined to find that the judge abused his discretion in performing his required gatekeeping function before closing arguments, instead of before the jury heard the evidence. Ibid. The panel stated that "[a]s with any other evidence inappropriate for the jury room, the judge may instruct the jury to disregard proofs that fail to meet the threshold standard of sufficiency." Ibid. (citations omitted).

With respect to the Borough's objections that the expert testimony was based on net opinions, the panel determined that there existed a "sufficient objective foundation for Hals's conclusion that the zoning board would likely grant a variance for the improved lot coverage." Id. at 538. Further, because there was a sufficient foundation for Hals's opinion, the panel determined that there was a sufficient foundation for Steck's

opinion and that there existed a proper basis for Brody's appraisal.  Id. at 538-39.[7]

We granted the Borough's petition for certification.  211 N.J. 274 (2012).  We also granted leave to the New Jersey State League of Municipalities to appear as amicus curiae.

II.

A.

As this Court recently stated,

> [t]he right to "just compensation" when the government takes property for a public use is one of the essential guarantees of both the United States and New Jersey Constitutions.  U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.");  N.J. Const. art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation.").  This fundamental right is of ancient origin, predating the founding of our Republic, and is found even in the text of the Magna Carta.  Magna Carta ch. 28 (1215), reprinted in The Anglo-American Legal Heritage 84 (Daniel R. Coquillette, 2d ed. 2004) ("No constable or other bailiff of ours shall take grain or other chattels of any one without immediate payment therefor in money . . . .").
>
> [Borough of Harvey Cedars v. Karan, ___ N.J. 214 N.J. 384, 402 (2013) (citation and footnote omitted).]

_____

[7] The panel also considered East Allendale's cross-appeal on whether compound interest should have been awarded on the judgment, id. at 539, and found no abuse of discretion in the trial court's determination to apply a simple rate of interest, id. at 542.  That issue is not before us.

27

In implementing constitutional requirements governing the taking of private property for government's use, the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, requires the state or one of its municipalities to pay the property owner just compensation for the taking of private property. Thus, when a parcel of property is acquired through the power of eminent domain, the landowner is entitled to receive from the state or municipality just compensation, defined as "the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." State v. Silver, 92 N.J. 507, 513 (1983); accord Caoili, supra, 135 N.J. at 260 (same). "[A]ll reasonable uses of the property bear on its fair market value[, but] most relevant in ascertaining fair market value is the property's highest and best use." Caoili, supra, 135 N.J. at 260. The highest and best use is the use that produces the highest value, provided the use can be legally and physically achieved. Cnty. of Monmouth v. Hilton, 334 N.J. Super. 582, 587-88 (App. Div. 2000), certif. denied, 167 N.J. 633 (2001).

What constitutes a reasonable use of the property must be "considered in light of any zoning restrictions that apply to the property," rendering zoning restrictions "material factors in determining its fair market value." Caoili, supra, 135 N.J.

28

at 260.  In two previous opinions, first Gorga and then as reaffirmed in Caoili, this Court set forth a standard to govern the consideration of zoning changes in respect of the future use of a property being valued for condemnation.  See id. at 261, 265.  We turn to those seminal cases.

B.

The dispositive issue in Gorga, supra, concerned the fair market value of a property on the date of the taking.  26 N.J. at 115.  The State contended that a potential amendment to a zoning ordinance made after the date of the taking should not be considered in determining the market value a reasonable buyer and seller would fix to the property.  Id. at 118.  Our Court concluded that a potential amendment to a zoning ordinance may affect the value of the property and designated, as a question of fact, whether the potential zoning change would affect the property value.  Id. at 117.  However, we cautioned that a court must first determine whether there is evidence of the probability of the zoning change before submitting the issue to the jury.  Ibid.

Gorga explained that the permissible uses of land, under the current applicable zoning ordinance, are critical in the determination of the fair market value of the property.  Id. at 116.  The jury may consider the value of the property if it were rezoned but only in determining the premium a willing buyer

29

would pay in addition to the value of the property under the existing ordinance.  Id. at 117.  In other words, after the judge determines that there is evidence of a probability of a zoning change, the jury then is to decide whether the parties to the transaction would consider the probability of the zoning change in formulating the value of the property.  Ibid.  Thus, the jury may consider the future ordinance amendment as evidence demonstrating that at the time of the taking the zoning change was reasonably probable and thus could affect the market value and the setting of fair compensation.  Id. at 118.

Following Gorga, we clarified its operational approach in Caoili, supra, establishing a clear two-step process:

> [I]n determining the fair market value of condemned property as a basis for just compensation, the jury may consider a potential zoning change affecting the use of the property provided the court is satisfied that the evidence is sufficient to warrant a determination that such a change is reasonably probable.
>
> [135 N.J. at 265.]

The two-step approach was explained as necessary to avoid "unbridled speculation" on the fair market value of the property.  Id. at 264 (internal quotation marks and citation omitted).  Under Caoili's framework, a court first must determine whether there is sufficient evidence to support the conclusion that a zoning change is "reasonably probable."  Id.

30

at 265. That evidence must "indicat[e] beyond a mere possibility that a change of use is likely and, further, that such a change would be an important factor in the valuation of the property." Id. at 264. The court performs this "gatekeeping function by screening out potentially unreliable evidence and admitting only evidence that would warrant or support a finding that a zoning change is probable." Ibid. In Caoili a trial court was instructed in the future to place on the record its basis for finding that sufficient evidence exists of a reasonable probability of a zoning change. See ibid.[8]

After that determination is made, the jury determines in a second step whether "a buyer and seller engaged in voluntary negotiations over the fair market value of the property [would reasonably believe] that a change may occur and will have an impact on the value of the property." Id. at 264-65. This determination does not require the jury to find that the zoning change is probable, nor to determine the degree of probability of the zoning change. Ibid. Instead, "even though the parties to a voluntary transaction may not believe that a zoning change is more likely than not, their belief that there may be a change should be taken into account if that belief is reasonable and it

_____

[8] That the process prescribed was not followed in the proceedings in Caoili, and the deficiency was treated as a question of harmless error in that matter, should not provide present day courts with a refuge from adhering to the threshold gatekeeping procedure that the Caoili Court outlined.

31

affects their assessment of the property's value." Id. at 265 (internal quotation marks and citation omitted). The parties' belief "may be considered in fixing just compensation in light of the weight and effect that reasonable buyers and sellers would give to such evidence in their determination of the fair market value of the property." Ibid. This Court in Caoili concluded that a jury could consider future variance approval and potential subdivision of the property in the valuation analysis. Id. at 265, 267.

Courts have applied the Caoili two-step process to evaluate opinions as to valuation of property based on a variety of future changes pertaining to a parcel of property. The Appellate Division in Hilton, supra, established that a jury may take into account the future assemblage of properties to determine fair market value. 334 N.J. Super. at 594. The Appellate Division also has recognized that the jury could consider the reasonable probability of future site plan approval when determining fair market value compensation. State by Comm'r of Transp. v. Hope Road Assocs., 266 N.J. Super. 633, 647-48 (App. Div. 1993), modified in part, 136 N.J. 27 (1994).

The utility of a two-step process is demonstrated further during the jury's actual determination of a just compensation award that takes into account a premium based on the reasonable probability of a zoning change. See Gorga, supra, 26 N.J. at

32

117 ("At most a buyer would pay a premium for that probability in addition to what the property is worth under the restrictions of the existing ordinance."); see, e.g., State by Comm'r of Transp. v. Market Assocs., 134 N.J. Super. 282, 285 (App. Div. 1975). The jury first must value the property in its current condition, considering the zoning at the time of the taking, which establishes the base value. Market Assocs., supra, 134 N.J. Super. at 285. And, second, the jury may consider the probability of the future zoning change or variance approval in determining the premium a buyer and seller would fix to the property. Ibid. That premium is added to the base value and includes an assessment of the risk of the change occurring or being approved. Ibid.

That authority guides our determination in this dispute.

III.

A.

In this instance, the Borough claims the trial proceedings were flawed because the trial court did not bar East Allendale's experts' testimony expressing opinions on the issuance of a c-2 bulk variance. To reiterate, the Borough's argument, simply stated, is as follows.

The Borough contends that Hals, Steck, and Brody proffered net opinions in their reports, and as elucidated through deposition testimony prior to trial, by concluding that a bulk

33

variance was reasonably probable to be granted.  Specifically, the Borough argues that the experts never properly addressed how the benefits to the community and to the zoning plan would be advanced by granting the variance from O-1 zoning requirements and how those benefits substantially outweighed any detriments to the zoning plan, which is what as the Zoning Board would be required to do before granting a c-2 flexible variance.  See N.J.S.A. 40:55D-70(c)(2).  The Borough contends that the reports of those experts lacked a proper foundation for the opinions rendered and that the trial court erred in not resolving the evidential issue at that stage of the proceeding by striking the reports and prohibiting the testimony.  The Borough argued that the court had a duty to perform its gatekeeping role under Caoili to make a finding on the reasonable probability of the issuance of a bulk variance prior to allowing the jury to hear the experts' testimony on valuation that was premised on the assumption that the bulk variance was reasonably probable to be granted by the Zoning Board.  According to the Borough, if the trial court was unwilling or unable to reach a determination on reasonable probability based on the experts' reports and the deposition testimony presented pretrial by the Borough, then the Borough alternatively contended that it was entitled to have the issue determined through an N.J.R.E. 104 hearing where, it

asserted, it would have been demonstrated that East Allendale was unable to satisfy the standard for reasonable probability.

East Allendale's argument is simply that the trial court did not commit an abuse of discretion in handling the proceedings as it did, in the interests of economy and efficiency, pursuant to its authority under N.J.R.E. 611. It contends, further, that the experts' opinions on the reasonable probability of a bulk variance issuing for this property were based on an ample and proper foundation.

B.

Both Gorga and Caoili addressed the trial court's gatekeeping duty to assess whether there exists sufficient evidence of a reasonable probability of a zoning change to permit an alternate use for a property taken under eminent domain to be considered when valuing property for just compensation. See Gorga, supra, 26 N.J. at 117; Caoili, supra, 135 N.J. at 264-65. Nevertheless, this appeal demonstrates the existence of some confusion as to how and when that gatekeeping function is to be exercised. The trial court and the Appellate Division both believed that so long as a determination of reasonable probability was made prior to the jury's deliberation on just compensation, the two-step process set forth in Gorga, and more particularly in Caoili, would be satisfied. We cannot agree.

35

The goal of Caoili, supra, was to avoid having the jury hear and consider speculative evidence that a zoning change was reasonably probable when assessing what a reasonable buyer and seller would be willing to pay for the property. See 135 N.J. at 264 ("The risk of unsound and speculative determinations concerning fair market value is real when that determination is based on evidence of a future change that is inherently vague or tenuous because it suggests no more than the possibility of change."). Although typically the highest and best use of a property is determined based on current zoning conditions, see Gorga, supra, 26 N.J. at 116, condemnation actions may include competing experts opining over the likelihood of obtaining a zoning change if the court first determines that there is a reasonable probability of such a change. For this reason, only when the trial court has first determined that the evidence is of a quality to allow the jury to consider the probability of a zoning change should the jury be permitted to assess a premium based on that zoning change, as Caoili, supra, explained. See 135 N.J. at 264-65; see also Gorga, supra, 26 N.J. at 117 (stating same). The gatekeeping function was assigned to the judge specifically to screen the jury from hearing mere speculation.

The trial court's pretrial ruling in the present matter, which left the determinations to be made at trial, simply failed

to satisfy the gatekeeping function that was envisioned, and described in detail, in Caoili, supra, 135 N.J. at 264-65. If, as the trial court here concluded, the issue could not be resolved to the court's satisfaction on the basis of paper submissions, then the Borough's request for a pretrial N.J.R.E. 104 hearing should have been granted and the issue thoroughly heard and resolved prior to the commencement of the trial in order that both parties' trial strategies could be properly focused.

That said, we do not suggest that every condemnation action involving a future zoning change will require the trial court to conduct an N.J.R.E. 104 plenary hearing prior to trial. The trial court should examine the evidence proffered in support of the reasonable probability of a zoning change and determine whether it can render its required determination based on the papers. However, the court must render its determination that there exists the reasonable probability of a zoning change based on the standard that would govern the particular zoning change under consideration -- here the standard that would govern the Board's determination about whether or not to grant a c-2 bulk variance. Neither the court nor the experts who were permitted to opine before the jury on the Board's issuance of a bulk variance for the improved lot coverage in the O-1 portion of the property engaged in that analysis completely. We cannot view

37

the existence of expert testimony in this record, even as a whole when amplified before the jury, as sufficient for the required threshold finding on reasonable probability that the court should have made in this matter.

It is not sufficient for experts to opine in conclusory fashion that such a bulk variance would have been issued in this matter without addressing all the criteria that the Board would have to find in order to grant the variance, particularly in light of the fact that the identical application had been presented previously to the Board, only to be withdrawn prior to final Board action after the application had been subjected to critical Board questioning and citizen opposition. Having an expert merely repeat the statutory standard for a c-2 bulk variance, and opine that the application would meet it, is an insufficient showing on which a court should base a finding of reasonable probability of the grant of a c-2 bulk variance, under Caoili, to allow the jury to hear that testimony and consider the change in zoning when determining just compensation. An expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Pomerantz Paper v. New Cmty Corp., 207 N.J. 344, 372 (2011) (quoting Polzo v. Cnty of Essex, 196 N.J. 569, 583 (2008)). This is evidence that has a strong capacity to influence the jury's valuation decision. The valuation of property taken by

eminent domain must be based on sound evidence.  The public's money is at stake.  A property holder is entitled to just compensation, not a windfall.

In this matter, review of the reports of Hals and Steck submitted pretrial, and as augmented by deposition testimony submitted in connection with the Borough's pretrial motions, reveals that the analyses inadequately addressed all the considerations that a Board must consider before it may grant a c-2 bulk variance.  The MLUL sets forth positive and negative criteria that the Board would have had to consider before the bulk variance in respect of this property could have been granted.  See N.J.S.A. 40:55D-70(c)(2); see also TSI E. Brunswick, LLC v. Zoning Bd. of Adjustment of E. Brunswick, 215 N.J. 26, 45-46 (2013) (discussing quality of proofs necessary to establish positive and negative criteria).  Neither Halls nor Steck addressed how granting the bulk variance permitting this particular property a more intense use than otherwise permitted by zoning ordinance would "actually benefit the community in that it represents a better zoning alternative for the property."  Kaufmann v. Planning Bd. for Twp. of Warren, 110 N.J. 551, 563 (1988).  They also failed to illustrate how the variance could "'be granted without substantial detriment to the public good and w[ould] not substantially impair the intent and the purpose of the zone plan and zoning ordinance.'"  See Lang

39

v. Zoning Bd. of Adjustment, 160 N.J. 41, 57 (1999) (quoting N.J.S.A. 40:55D-70(d)).  As noted earlier, all the experts pointed to in this respect were zoning actions taken in other towns, which ordinarily are not relevant to a particular municipality's zone plan, and properties in Saddle River that were improved at a time that long preceded enactment of the current ordinance and therefore were governed by a more lax standard for improved lot coverage then in place.  Put another way, neither Hals nor Steck explained the "why or wherefore" as to whether the benefits to the community "substantially outweigh[ed] any detriment" to the zoning plan as required by N.J.S.A. 40:55D-70(c)(2).  See Pomerantz Paper, supra, 207 N.J. at 372.[9]  Furthermore, Brody's opinion on valuation relied on Hals's opinion in respect of the probability of the bulk variance being granted.  Therefore, Brody's opinion provided no separate support on that issue.  Due to the failure to address these essential components of a bulk variance application, the opinions expressed by Hals, Steck, and Brody lacked a proper foundation for their conclusions and, thus, their opinions provide an inadequate basis for the finding of a reasonable

---

[9] The Appellate Division relied on Hals's conclusions in his 2010 report; however, those conclusory statements fail to address, analyze, and compare the positive and negative criteria outlined in the standard articulated by the Legislature in N.J.S.A. 40:55D-70(c)(2).

40

probability of a zoning change that the trial court is required to make in fulfilling its gatekeeper function under Caoili.

The Borough had requested a pretrial hearing as an alternative to the striking of the experts' reports prior to trial in the event that the trial court did not agree that the reports contained opinions that lacked a proper foundation for the conclusions reached therein. The court rejected that application, estimating that a pretrial hearing on the experts' opinions would be too time-consuming,[10] and opted instead to allow for enhancement of the testimony at trial where an appropriate foundation might be established. The experts' testimony did not cure the deficiency in the required analysis for reasonable probability of issuance of a c-2 bulk variance for the property.

Thus, the result of the court's deferral was to permit the jury to hear speculative testimony about the reasonable probability of a zoning change authorizing a c-2 bulk variance for the property. That result was at odds with the careful two-step approach established in Caoili, which took pains to avoid having the jury hear such evidence unless and until the trial court has performed its gatekeeping role and has made a valid

---

[10] In fact, a Rule 104 pretrial hearing would only have been necessitated for Hals's and Steck's opinions that a reasonable probability existed for the issuance of a bulk variance because that is the threshold issue for which the court is responsible under Caoili.

finding as to reasonable probability of the zoning change.  The court's determination must use correct standards for the zoning change involved, rest on a sound evidential foundation, and be explained on the record to facilitate appellate review.

Because of the procedures followed in this matter, the condemnation award in this matter cannot stand.  A new trial on just compensation is required.

IV.

The judgment of the Appellate Division is reversed, and the matter is remanded for a new trial on just compensation.

JUSTICES HOENS and PATTERSON join in JUSTICE LaVECCHIA's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion, in which CHIEF JUSTICE RABNER joins.  JUDGES RODRIGUEZ and CUFF (both temporarily assigned) did not participate.

BOROUGH OF SADDLE RIVER,

    Plaintiff-Appellant,

       v.

66 EAST ALLENDALE, LLC,

    Defendant-Respondent.


    JUSTICE ALBIN, dissenting.

    By ignoring the record, the majority overthrows a damages award rendered by a jury in a condemnation case after a ten-day trial. Although the majority and dissent have different opinions about this case, the majority is not entitled to its own facts. The majority's decision cannot be reconciled with the record. Nor can it be reconciled with the deferential standard of review that cautions this Court against substituting its judgment for evidentiary rulings made by the trial court and factual determinations made by the jury.

    The Borough of Saddle River (Borough) took property of 66 East Allendale, LLC (East Allendale) through its power of eminent domain. East Allendale was entitled to just compensation for the taking based on the highest and best use of the property. East Allendale presented expert testimony that the highest and best use of the property was the construction of

1

a 10,000-square-foot bank. Because construction of a bank required a bulk variance, East Allendale also presented expert testimony that it was reasonably probable that the zoning board of adjustment would have granted such a variance. In contrast, the Borough offered expert testimony that a bulk variance would not have been granted.

Based on the record, which included hearing all of the expert testimony, the trial judge performed his gatekeeping role and made thorough and careful evidentiary findings. He concluded that a reasonable probability existed that the zoning board would have granted a bulk variance. It was for the jury to determine whether a bulk variance would have been granted and the fair market value of the property taken by the Borough. After considering the expert testimony of both sides, the jury returned an award in favor of East Allendale in the amount of $5.25 million.

In a thoughtful and well-reasoned opinion by Judge Fasciale, and joined by Judges Rodríguez and Sabatino, the Appellate Division affirmed the trial judge's rulings and the jury's award. Borough of Saddle River v. 66 E. Allendale, LLC, 424 N.J. Super. 516 (App. Div. 2012). In reversing the jury, the trial judge, and the Appellate Division, the majority states that there was not a foundational basis for East Allendale's expert testimony. But to reach that conclusion the majority has

2

to turn a blind eye to the meticulously detailed testimony of East Allendale's experts. I dissent because the majority has failed to give proper deference to the trial court's evidentiary rulings and, more importantly, to the factfindings of the jury. This Court should not be the decisive juror.

Because the majority's errors flow from its failure to give East Allendale the benefit of a fair and faithful reading of the record, it is to the record that I turn.

I.

East Allendale owned a 2.13-acre tract of property in the Borough of Saddle River on which it had been attempting to construct a bank. Saddle River, a community zoned 98% residential, acquired the property through eminent domain for the purpose of developing a park.

East Allendale's property straddled the Borough's office and residential zones, with one-third of the lot in the office zone and two-thirds in the residential zone. The Borough's ordinances contained an improved-lot-coverage maximum, which required buildings and accompanying parking lots constructed in the office zone to occupy no more than 30% of a lot's total surface area. East Allendale, however, claimed that the highest and best use of the property would be the construction of a

3

10,000-square-foot bank building that, with the parking lot, would cover 42% of the lot's surface area.

The parties did not dispute that the construction of a bank would be the highest and best use of the property. Indeed, one of East Allendale's experts, a retail and bank developer, testified that the property was located in a prime spot for a bank. The Borough also conceded that the zoning board would have granted East Allendale a use variance to allow parking in that portion of the lot zoned residential.

The battle lines between the parties were drawn over whether the zoning board of adjustment would have granted a bulk variance for East Allendale's proposed construction of a bank. So long as the trial judge was persuaded that the grant of a bulk variance was reasonably probable, then the impact of a potential variance on the fair market value of the property was for the jury's ultimate determination. See State by Comm'r of Transp. v. Caoili, 135 N.J. 252, 265 (1994) ("[T]he jury may consider a potential zoning change affecting the use of the property provided the court is satisfied that the evidence is sufficient to warrant a determination that such a change is reasonably probable."). The trial judge determined that East Allendale met its evidentiary burden. That the judge made his ruling after hearing the trial testimony of East Allendale's experts clearly would not be a reason for throwing out the

4

jury's verdict. The judge exercised caution in not rendering a decision until after hearing the experts' testimony.

Boiled down to its essence, the question is whether East Allendale's experts gave a foundation for their conclusions. An expert witness must "give the why and wherefore that supports the opinion," and not present a mere conclusion. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011) (citations omitted). East Allendale's experts did just that -- they did not give "bare opinion[s] that ha[ve] no support in factual evidence or similar data." See ibid.

East Allendale, through its experts, merely had to establish that there was a reasonable probability that the variance would have been granted. See Caoili, supra, 135 N.J. at 265; State by Highway Comm'r v. Gorga, 26 N.J. 113, 116 (1958). For the grant of a bulk variance, as with any variance, an applicant must satisfy "positive" and "negative" criteria under N.J.S.A. 40:55D-70c(2) of the Municipal Land Use Law (MLUL). See Smart SMR, Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 323 (1998). In order to establish that it was reasonably probable that the zoning board would grant the bulk variance, East Allendale had to address the positive criteria -- that (1) the MLUL's purposes "would be advanced by a deviation from the zoning ordinance" and that (2) "the benefits of the deviation would substantially outweigh any

5

detriment," N.J.S.A. 40:55D-70c(2), and the negative criteria -- that a variance (3) could be "granted without substantial detriment to the public good" and (4) "[would] not substantially impair the intent and the purpose of the zone plan and zoning ordinance," N.J.S.A. 40:55D-70. See Kaufmann v. Planning Bd. for Twp. of Warren, 110 N.J. 551, 553 (1988).

The experts, through their trial testimony and pretrial reports, presented opinions not only based on an extensive factual record, but also firmly anchored in the law.

A.

East Allendale offered as experts David Hals, a professional engineer and planner with degrees in applied science and civil engineering, and Peter Steck, a professional planning consultant with degrees in civil engineering and city and regional planning. In their reports and testimony, they expressed their expert opinions that there was a reasonable probability that the zoning board of adjustment would have granted a bulk variance for the construction of a bank (comprising 7.11% lot coverage) and a parking lot (comprising 34.89% lot coverage). Jon P. Brody, a certified general appraiser, also testified that, based on Hals's proposed plan, there was a reasonable probability that a variance would have been granted. Brody concluded that the market value of East

6

Allendale's property under Hals's proposed plan was $5,250,000 as of November 8, 2006.

East Allendale's experts addressed each of the positive and negative criteria in considering whether a bulk variance was reasonably probable.[1]

1.

East Allendale proposed replacing an aging gas station and constructing a modern bank building. Hals explained in detail, in his report and testimony, that the substitution of a bank building for a decrepit gas station was a benefit to the community because a bank was more consistent with the commercial character of the area, and thus a more "appropriate development of the land." Thus, the bulk variance "would encourage the appropriate use or development of land" and "promote a desirable visual environment through good civic design." See Kaufmann, supra, 110 N.J. at 562-63 (noting that c(2) "purpose" requirement may be met by advancing "specific purposes of zoning set forth in the MLUL"). Additionally, according to Hals, the proposed parking area behind the bank would preserve open space

_____

[1] Steck also opined that it was reasonably probable that the zoning board would have granted a variance to the parking-space minimums set forth in the Borough's ordinance. Under Steck's alternative plan, which complied with the 30% improved-lot-coverage maximum, the zoning board would have approved a bank building of the same size but with a smaller parking lot. It does not appear that this alternative theory was pressed by East Allendale.

7

and maintain sight lines, while embankments and landscaping would promote a desirable visual environment. Hals emphasized that a bulk variance was necessary because the existing zoning ordinance made development of the land nearly impossible. Hals testified that it was not practicable to construct a 10,000-square-foot building in a zone with a 30% improved-lot-coverage maximum.

Consistent with his expert report, Hals explained that none of the commercial property in Saddle River complied with the 30% improved-lot-coverage maximum. The other properties in the office and business zones had improved-lot coverage of between 65% and 85%. Significantly, the Borough's present 30% coverage requirement rendered all the properties in the office and business zones non-conforming uses. Thus, without the grant of a bulk variance, only East Allendale's property would be required to comply with the coverage requirement. Hals's report also explained that Saddle River's improved-lot-coverage maximum was one-half of that permitted in the ordinances of nearby municipalities. Therefore, restricting East Allendale to a 30% improved-lot-coverage maximum was atypical not only in Saddle River, but also in surrounding communities.

Steck's report and testimony supported much of Hals's presentation. Steck too testified that all the uses in the Borough's office zone exceeded the 30% lot coverage and that a

8

failure to grant a bulk variance would not have been consistent with the MLUL. From his viewpoint, the strict application of the zoning ordinance would cause an "extreme hardship" because the property otherwise could not be feasibly developed for commercial purposes.

2.

Hals also explained that the benefits of the variance would substantially outweigh any detriment. Hals underscored that the benefits of a variance included development of the space with an adequately sized building and parking area, while nonetheless preserving 58% of the lot for landscaping, greenery, and wooden areas. Hals also stated that East Allendale intended to place the parking lot behind the building, thereby screening the parking lot from view on the street. Meanwhile, any detriments, such as light pollution and water runoff, were minimized by the plan's design.

Steck also concluded that the proposed bank building conferred significant developmental benefits that outweighed any detriments. In particular, he stated that Hals's planned landscaping and rainwater detention facilities would "address what would otherwise be looked at as negative aspects."

3.

Hals testified that the grant of a variance would not have imposed a substantial detriment to the public good. Hals noted

9

that the proposed development, including its lot coverage, would be consistent with the businesses in the Borough's commercial area. Hals maintained that the proposed improved coverage of 42% was not a "large scale development," was not "overbuilding the property," and that any resulting water runoff could be readily managed. Hals added that the plan called for adequate screening between the street and the parking area, and between the bank and residential areas.

Steck pointed out that the other businesses in the Borough's commercial area had lot coverage of over 60%, and thus the proposed development would be consistent with the office and business zones. He also maintained that the plan's proposed driveways and parking layout were designed with safety in mind.

4.

In concluding that a variance in this case would not substantially impair the intent and purpose of the zone plan, Hals considered the existing and past zone plans and that the proposed bank building would be consistent with the other commercial uses in the zone. Hals highlighted that the proposed use was a <u>permitted</u> use in the office zone.

Steck concurred that the proposed bank was consistent with the office zone and "the history of [the Borough's] master plan documents." He further noted that the Borough had recognized that, along East Allendale Road, residential use was decreasing

10

and commercial use was increasing and, on that basis, the Borough had recommended a review of the zoning plan in that area. Steck stressed that East Allendale's plan would enable "reasonable use" of its property given its location in the Borough's commercial area.

## II.

### A.

The trial judge denied the Borough's motion to strike East Allendale's expert opinions. The judge concluded that the opinions of East Allendale's experts were grounded in the record. In denying the Borough's motion for a new trial, the judge cited to the evidentiary support for his conclusion that there was a reasonable probability that a bulk variance would have been granted. The judge pointed out that: (1) the Borough had granted similar variances in the past; (2) no existing properties in the office zone complied with the 30% improved-lot-coverage maximum, and past developments had 65-80% improved-lot coverage; and (3) the proposed plan would conform to the physical characteristics of the surrounding commercial properties and not adversely impact nearby residential properties.

### B.

Hundreds of pages of reports, deposition testimony, and trial testimony amply support the trial judge's determination that both Hals and Steck gave the "why and wherefore" of their opinions. No fair reading of this record suggests that their opinions were lacking in factual and legal support. Moreover, the majority has seemingly raised the bar for obtaining a bulk variance. If this record does not show that there was a reasonable probability that a zoning board would or should have granted a bulk variance, then we are unlikely ever to see such a record. In this regard, the majority's opinion may have unintended consequences in typical applications for bulk variances.

C.

Today, the majority holds that the determination of whether a zoning variance was reasonably probable should be decided in a pretrial hearing. Neither Gorga nor Caoili instructs trial judges to perform the gatekeeping function before witness testimony is presented to the jury.

Indeed, nothing in N.J.R.E. 104(a) suggests that the trial judge could not have proceeded as he did. The judge did not feel prepared to make the admissibility determination based on the expert reports and deposition testimony -- the cold record. Instead, he wanted to hear from the witnesses themselves, and, to conserve judicial resources, he decided not to conduct a

12

multi-day dry run.  In accordance with N.J.R.E. 104(a), he permitted the expert witnesses to testify and withheld the admissibility determination until a later time.  See N.J.R.E. 104(a) ("When the . . . admissibility of evidence . . . is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge.").  Although N.J.R.E. 104(a) permits a judge to "hear and determine such matters out of the presence or hearing of the jury," he is not required to do so.  Judges are given broad discretion to manage the presentation of witnesses to "avoid needless consumption of time."  N.J.R.E. 611(a).  So long as the trial judge correctly decided the admissibility of the expert testimony and correctly submitted to the jury the zoning variance issue, there is no reason to overturn the jury's verdict.

D.

To summarize, it is not the function of this Court to substitute its evidentiary decisions for those of the trial court.  "[W]e apply . . . [a] deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard."  Pomerantz Paper, supra, 207 N.J. at 371-72 (citing Kuehn v. Pub Zone, 364 N.J. Super. 301, 319-21 (App. Div. 2003), certif. denied, 178 N.J. 454 (2004)); see also Carey v. Lovett, 132 N.J. 44, 64 (1993) ("Ordinarily,

13

the competency of a witness to testify as an expert is remitted to the sound discretion of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion.") (citing Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 411 (1960)).

The majority has merely substituted its judgment for that of the trial judge, who not only had the opportunity to hear the witnesses' testimony, but also had the feel of the case, which can never be conveyed by the cold record. The record clearly supports the trial judge's decision to admit the expert testimony and to submit the issue concerning the zoning variance to the jury. Even if this case were a close call, which it is not, we would be required to defer. In my view, the majority's decision to reverse both the trial judge and the Appellate Division is without foundation.

For this reason, I respectfully dissent.

CHIEF JUSTICE RABNER joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO. __A-126__                      SEPTEMBER TERM 2011

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


BOROUGH OF SADDLE RIVER,

    Plaintiff-Appellant,

        v.

66 EAST ALLENDALE, LLC,

    Defendant-Respondent.


DECIDED      October 21, 2013 _____
_____ Chief Justice Rabner _____ PRESIDING

OPINION BY _____ Justice LaVecchia _____

CONCURRING/DISSENTING OPINIONS BY _____

DISSENTING OPINION BY _____ Justice Albin _____

| CHECKLIST | REVERSE AND REMAND | AFFIRM |
|---|---|---|
| CHIEF JUSTICE RABNER | | X |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE HOENS | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | ------------------------ | -------------------- |
| JUDGE CUFF (t/a) | ------------------------ | -------------------- |
| TOTALS | 3 | 2 |

1